Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY MORGA, derivatively on behalf of MULLEN AUTOMOTIVE INC., <br><br> Plaintiff, <br><br> v. <br><br> DAVID MICHERY, JONATHAN NEW, JOHNATHAN ANDERSEN, MARK BETOR, WILLIAM MILTNER, IGNACIO NOVOA, KENT PUCKETT, and MARY WINTER, <br><br> Defendants, <br><br> and <br><br> MULLEN AUTOMOTIVE INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

# INTRODUCTION

Plaintiff Gary Morga ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Mullen Automotive Inc. ("Mullen" or the "Company"),

files this Verified Shareholder Derivative Complaint against defendants David Michery ("Michery"), Johnathan New ("New"), Johnathan Andersen ("Andersen"), Mark Betor ("Betor"), William Miltner ("Miltner"), Ignacio Novoa ("Novoa"), Kent Puckett ("Puckett"), and Mary Winter ("Winter") (collectively, the "Individual Defendants," and together with Mullen, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Mullen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Michery and New for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mullen, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 2022 to March 13, 2024, inclusive (the "Relevant Period").

2.      Mullen is Delaware-incorporated automotive company focused on producing electric vehicles ("EVs") by working with partners with the aim of offering luxury SUVs, sports cars, cargo vans, and solid-state batteries.

3.      The Company hosted a shareholder meeting on December 23, 2022, (the "December 23rd Shareholder Meeting") where the Company asked investors to vote on,

*inter alia*, a reverse stock split.

4.    Defendant Michery was in favor of the reverse stock split which was evidenced by Mullen's issuance to him of a single Class AA preferred stock which came with 1.3 billion votes. Defendant Michery's shares were immediately redeemable for cash upon the reverse stock split's effectuation.

5.    Even though the reverse stock split was approved, on January 25, 2023, the Company announced it "has no plans at the current time to effect a reverse split."

6.    On March 6, 2023, the Company announced in a press release titled "Rapid Response Defense Systems Selects Mullen Automotive as the Exclusive Provider for Class 1 EV Cargo Vans" (the "March 6th Press Release") that the Company was being fast tracked through a partnership with the Rapid Response Defense Systems ("RRDS") to provide the government with large-scale vehicle fleet orders.

7.    Later, on April 18, 2023, the Company announced through a press release (the "April 18th Press Release") that it was forming a joint venture called Mullen Advanced Energy Operations, LLC ("MAEO"), with Global EV Technology, Inc. MAEO was purportedly set to produce energy management technologies starting with EVs with later plans to scale to other energy applications.

8.    Among other things, the April 18th Press Release detailed Global EV Technology's Chief Scientific Officer Lawrence Hardge's ("Hardge") accomplishments.

9.    Later, on May 15, 2023, the Company issued a press release titled "Mullen Automotive Provides Business Update" (the "May 15 Press Release"). The May 15 Press Release stated that MAEO's battery technology, named Energy Management Module ("EMM"), was tested by Hardge and Mullen engineers in a Mullen vehicle and that the test results showed EMM had increased battery capacity by 44%.

10.    The May 15th Press Release also announced that Washington D.C. had awarded Global EV Technologies, LLC a $680,000 contract for the purchase and installation of the Company's EMM units on a fleet of forty Chevrolet Bolts.

11.    The truth about Hardge and Mullen's battery technology began to emerge on June 8, 2023, when a report from Jalopnik came out titled "I'm Not EV Startup Executive Lawence Hardge" (the "Jalopnik Report"). The Jalopnik Report revealed that test results that claimed the EMM technology could increase battery capacity and range were misleading because the test was not conducted on a "top EV" as claimed but instead on a gold cart without wheels touching the ground.

12.    On June 20, 2023, Investorplace issued a report titled "MULN Stock: Is Larence Hardge Backing Away from Mullen Deal?" (the "Investorplace Report"). The Investorplace Report highlighted comments made by Hardge and questioned whether the partnership between Hardge and Mullen had fallen apart.

13.    On June 21, 2023, the Company issued a press release (the "June 21st Press Release") stating that even though the Company's stock price declined over 95% in the past year, the Company "has already met or is positioned to meet previously announced objectives."

14.    The truth continued to emerge on July 5, 2023, when a report was published by Fastcompany titled "The wild saga of a convicted fraudster, a troubled EV company, and the promise of a perfect battery" (the "Fastcompany Report"). The Fastcompany Report detailed Hardge's criminal past and questioned the capabilities of the EMM technology.

15.    On July 11, 2023, the Company filed a Form 8-K with the SEC (the "July 11th Form 8-K") announcing that Mullen had terminated its relationship with Hardge and Global EV Technology, Inc. According to the July 18th Form 8-K, Global EV Technology, Inc. had breached the agreement several times including:

(1)Failing to execute documents evidences an irrevocable, royalty-free, worldwide exclusive license to the Technology and IP, in perpetuity to MAEO, (2) refusing to conduct any tests of the technology at a Mullen approved facility after the LOA, (3) repeatedly refusing to honor the terms of the Mutual Non-Disclosure Agreement signed April 14, 2023, and (4) failing

1  to disclose all claims or threatened legal actions by any third parties related to
2  the technology.

3      16.    The truth continued to emerge on July 17, 2023 when a report came out by
4  WUSA9 titled "Convicted felon gets DC contract to install car battery tech called
5  impossible by experts" (the "July 17th WUSA9 Report"). The July 17th WUSA9 Report
6  interviewed electrical engineers who stated that the purported capabilities of the
7  Company's EMM technology were currently impossible. The July 17th WUSA9 Report
8  also detailed Hardge's criminal past, which had not fully been disclosed to investors. In
9  addition, the July 17th WUSA9 Report stated that Washington D.C. terminated the
10  $680,000 contract.

11      17.    WUSA9 issued a follow up report on August 7, 2023, titled "WUSA9
12  investigates how DC government fell for convicted fraudster's invention claims" (the
13  August 7th WUSA9 Report"). Hardge responded to the claims in the July 17th WUSA9
14  Report by showing off the EMM technology and its purported capabilities. However,
15  WUSA9 took the evidence shown to them to an electrical engineer who further disputed
16  Hardge's claims about EMM's capabilities.

17      18.    The truth fully emerged on March 13, 2024 when the Company provided an
18  update on its partnership with RRDS through a press release titled "Mullen Automotive
19  Provides Timeline Update on US Government Ruling for Class 1 EV Cargo Vans" (the
20  "March 13th Press Release"). The March 13th Press Release stated that the Company
21  needed to wait for the U.S. General Services Administration ("GSA") to make a final
22  determination on the ruling. The March 13th Press Release further stated that "Mullen and
23  RRDS are now proceeding with the GSA in order to finalize qualification of Mullen to sell
24  Class 1 EV cargo vans to all branches of the U.S. government."

25      19.    Upon information and belief, the Company has not successfully submitted the
26  necessary information for the Company to participate in or benefit from government
27  contracts with its partner RRDS. At no point has the Company been "fast-tracked" to
28  receive government contracts for large-scale vehicle fleet orders.

20.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company claimed it had an intent to implement a reverse stock split in early 2023, when it had no intent to do so; (2) the Company overstated its deals with its purported business partners, MAEO and RRDS; (3) the Company overstated its battery technology; (4) Defendants mislead the public about future reverse stock splits; (5) Defendants failed to conduct proper due diligence and disclosure regarding Hardge's previous financial crimes; and (6) Defendants failed to disclose material information about the Company's financing agreements, including those with Esousa Holdings. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

21.    During the Relevant Period, the Individual Defendants also made a series of materially false and misleading statements regarding the Company's completed and/or amended financing agreements with Esousa Holdings, LLC ("Esousa Holdings"). Michael Wachs ("Wachs") is the managing member of Esousa Holdings and has sole voting control and investment discretion over securities beneficially owned directly by Esousa Holdings. Esousa Holdings beneficially owns 9.9% of the Company's stock. At all relevant times, the Individual Defendants touted Mullen's dealings with Esousa Holdings while simultaneously failing to disclose material information, *inter alia*, that Wachs had pled guilty in 1997 to defrauding Chase Manhattan Bank for $20 million and, further, that Wachs had received a lifetime ban from FINRA, NASD, and the board of governors of the Federal Reserve.

22.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering

them personally liable to the Company for breaching their fiduciary duties.

23.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while four of the Individual Defendants engaged in improper insider sales, netting total proceeds of *approximately $6.6 million*.

24.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

25.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and Chairman of the Company's Board of Directors (the "Board"), and its Chief Financial Officer ("CFO") to two federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (the "Securities Class Actions") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

26.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

27.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Michery's and New's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

29.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Mullen is headquartered in this District.

## **PARTIES**

### **Plaintiff**

32.     Plaintiff is a current shareholder of Mullen. Plaintiff has continuously held Mullen's common stock at all relevant times.

### **Nominal Defendant Mullen**

33.     Mullen is a Delaware corporation with principal executive offices at 1405 Pioneer Street, Brea, California, 92821. Mullen's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "MULN."

### **Defendant Michery**

34.     Defendant Michery has served as Chairman of the Board and CEO of the Company since November 2018.

35.     The Schedule 14A the Company filed with the SEC on March 13, 2025 (the

"2025 Proxy Statement") stated the following about Defendant Michery:

> **David Michery** has served as the Chairman of the Board, President and Chief Executive Officer of the Company since the closing of the Merger in November 2021 and held those same positions at Mullen Technologies since its inception in 2018. His automotive experience began with the acquisition of Mullen Motor Company in 2012. Mr. Michery brings over 25 years within executive management, marketing, distressed assets, and business restructuring. He acquired the assets of Coda Automotive, formerly an independent EV manufacturer, through bankruptcy as an entryway into the EV business. We believe that Mr. Michery is qualified to serve as a director because of his operational and historical expertise gained from serving as our Chief Executive Officer, and his experience within various businesses, including automotive.

36.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Michery made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| May 23, 2022 | 750,000[1] | $1.0145[2] | $761,249 |
| June 15, 2022 | 150,000[3] | $1.1017[4] | $165,300 |
| June 29, 2022 | 350,000[5] | $1.1199[6] | $392,000 |

[1] The Form 4 filed with the SEC states: "Aggregate number of shares sold on the same date at difference prices."

[2] The Form 4 filed with the SEC stated: "Represents the weighted average sales price. The shares were sold in multiple transactions at prices ranging from $1.00 to $1.070, inclusive, per share."

[3] The Form 4 filed with the SEC states: "Aggregate number of shares sold on the same date at difference prices."

[4] The Form 4 filed with the SEC states: "Represents the weighted average sales price. The shares were sold in multiple transactions at prices ranging from $1.08 to $1.14, inclusive, per share."

[5] The Form 4 filed with the SEC states: "Aggregate number of shares sold on the same date at difference prices."

[6] The Form 4 filed with the SEC states: "Represents the weighted average sales price. The shares were sold in multiple transactions at prices ranging from $1.11 to $1.250,

| September 22, 2022 | 750,000[7] | $0.3965[8] | $297,750 |
| February 16, 2023 | 14,937,660[9] | $0.3164[10] | $4,720,300 |

Thus, in total, before the fraud was exposed, Defendant Michery sold 16,937,660 shares of Company stock on inside information, for which he received approximately $6.3 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant New**

37.    Defendant New has served as the Company's CFO since September 19, 2022. Defendant New also served as CFO of the Company's predecessor, Net Elements, Inc.

38.    The 2025 Proxy Statement stated the following about Defendant New:

***Jonathan New*** was appointed by the Board as Chief Financial Officer of the Company, effective September 19, 2022. He served as a director of the Company from November 2021 until September 19, 2022. From January 2020 until September 2022, Mr. New served as the Chief Financial Officer of Motorsport Games, Inc. (NASDAQ: MSGM), a racing game developer, publisher and esports ecosystem provider. Previously, from July 2018 to January 2020, Mr. New was Chief Financial Officer of Blink Charging Co (NASDAQ: BLNK), an owner, operator and provider of electric vehicle charging equipment and networked electric vehicle charging services, and, from 2008 to July 2018, he was Chief Financial Officer of Net Element, Inc., a global technology and value-added solutions group that supports

inclusive, per share."

[7] The Form 4 filed with the SEC states: "Aggregate number of shares sold on the same date at difference prices."

[8] The Form 4 filed with the SEC states: "Represents the weighted average sales price. The shares were sold in multiple transactions at prices ranging from $0.39 to $0.41, inclusive, per share."

[9] The Form 4 filed with the SEC states: "Aggregate number of shares sold on the same date at difference prices."

[10] The Form 4 filed with the SEC states: Represents the weighted average sales price. The shares were sold in multiple transactions at prices ranging from $0.2967 to $0.3389, inclusive, per share."

electronic payments acceptance in a multi-channel environment. Mr. New is a Florida Certified Public Accountant and a member of the American Institute of Certified Public Accountants.

**Defendant Andersen**

39.     Defendant Andersen has served as a Company director since September 2022. He also serves as a member of the Compensation Committee and as a member of the Audit Committee.

40.     The 2025 Proxy Statement stated the following about Defendant Andersen:

*John Andersen* has served as director of the Company since September 2022. Mr. Andersen owned and operated various businesses since 1972, concentrating on real estate investment and management, primarily of multi-family residential units along with commercial sales and leases, in California, Utah and Wyoming, since 1980. From 1986 to 1996, Mr. Andersen was a partner in a large real estate company with over 300 sales agents and an escrow company, loan company and other real estate services. Since 2013, he has been a director and officer of Eminence Escrow, Inc. and, since 2015, he has owned and operated DNJ Investments, Inc., both of which provide escrow services. We believe that Mr. Andersen is qualified to serve as a director because of his extensive and in-depth experience in operating and growing businesses.

41.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Andersen made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| October 20, 2023[11] | 287,437 | $0.3437[12] | $98,878 |

---

[11] The Form 4 filed with the SEC states: "Except as indicated in footnote 3, share amounts and price do not reflect reverse stock splits subsequent to date of sale. Shares held following transaction reflect amount as of such date."

[12] The Form 4 filed with the SEC states: "The price reported in Column 4 is a weighted average price. These shares were sold in multiple transactions at prices ranging from $0.36 to $0.3436 (on a pre-split basis), inclusive. The reporting person undertakes to provide to the issuer, any security holder of the issuer, or the staff of the Securities and Exchange

| January 26, 2024 | 13,334 | $6.7738 | $90,324 |
|---|---|---|---|

Thus, in total, before the fraud was exposed, Defendant Andersen sold 300,771 shares of Company stock on inside information, for which he received approximately $189,202 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Betor**

42. Defendant Betor has served as a Company director since November 2021. He also serves as a member of the Audit Committee and Compensation Committee and as Chair of the Nominating & Governance Committee.

43. The 2025 Proxy Statement stated the following about Defendant Betor:

*Mark Betor* has served as a director of the Company since November 2021 and a director of Mullen Technologies since 2018. Mr. Betor has also served as a director of DRIVEiT since January 2024. Mr. Betor is a retired businessman and law enforcement officer. Since retirement, he has been involved with real estate investments and private business. We believe that Mr. Betor is qualified to serve as a director because of his vast experience within investments and private businesses.

**Defendant Miltner**

44. Defendant Miltner has served as a Company director since November 2021.

45. The 2025 Proxy Statement stated the following about Defendant Miltner:

*William Miltner* has served as a director of the Company since the closing of the Merger. He has served as a litigation attorney for over 30 years. He is the co-founder of Miltner & Menck, APC, a full-service law firm, in San Diego, CA. Mr. Miltner successfully co-founded and co-managed the law firm of Perkins & Miltner, LLP, a respected San Diego litigation firm for 13 years. In 2006, when co-founder David Perkins left the practice of law, Miltner Law Group, APC, was founded. Mr. Miltner has represented many publicly traded and private companies including residential developers, construction

Commission, upon request, full information regarding the number of shares sold at each separate price within the ranges set forth in footnote 2 to this Form 4."

contractors, title insurance companies and banking and lending institutions. His substantial experience includes representing and defending clients in complex real property, general business, construction, title insurance and lender litigation and transactional matters. Mr. Miltner is member of the American and San Diego County Bar Associations and American Business Trial Lawyers Association. He was admitted to The State Bar of California in 1988. We believe that Mr. Miltner is qualified to serve as a director because of his knowledge and experience within law practice areas and litigation matters.

### Defendant Novoa

46.    Defendant Novoa has served as a Company director since July 2022.

47.    The 2025 Proxy Statement stated the following about Defendant Novoa:

***Ignacio Novoa*** has served as a director of the Company since July 2022. Mr. Novoa has been a realtor at Las Lomas Realty since January 2015. Prior to that, from August 2008 to March 2021, Mr. Nova served as police officer with the Federal Reserve Police and, from September 2008 to March 2013, as program security at Northrup Grumman. Mr. Novoa has also served as a director of DRIVEiT since January 2024. We believe that Mr. Novoa is qualified to serve as a director because of his experience in managing real estate.

### Defendant Puckett

48.    Defendant Puckett has served as a Company director since November 2021. He also serves as the Chairperson of the Compensation Committee and Audit Committee and is a member of the Nominating & Governance Committee.

49.    The 2025 Proxy Statement stated the following about Defendant Puckett:

***Kent Puckett*** has served as a director of the Company since November 2021 and has served on the board of Mullen Technologies since 2018. Previously, Mr. Puckett served as the Chief Financial Officer of Mullen Technologies from 2012 to 2018. Mr. Puckett has also served as a director of DRIVEiT since January 2024. Mr. Puckett has many years of experience as a CFO with a proven track record of establishing cross-functional partnerships to deliver stellar results. He has led many companies in their audit and disclosure requirements, creating operations, marketing, and sales division budgets of multi-million dollars, and being accountable for the allocation of resources to exceed profit and sales goals. Mr. Puckett has a B.S. in Business

Administration from Pensacola Christian College, and Advanced Studies in Management, Finance, Compliance, Insurance, Financial Consulting, Taxation and Financial Reporting, with an emphasis on Public Companies reporting and audit requirements. We believe that Mr. Puckett is qualified to serve as a director because of his finance and accounting background and experience.

50.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Puckett made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|-----------------------|--------------|
| December 15, 2022 | 100,000 | $0.33 | $33,000 |

Thus, in total, before the fraud was exposed, Defendant Puckett sold 100,000 shares of Company stock on inside information, for which he received approximately $33,000 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Winter**

51.     Defendant Winter has served as a Company director since November 2021. She also serves as the Company's Secretary and as a member of the Nominating & Governance Committee.

52.     The 2025 Proxy Statement stated the following about Defendant Winter:

***Mary Winter*** has served as director of the Company since November 2021 and has been a director of Mullen Technologies since 2018. Ms. Winter has been an integral part of Mullen since inception. She currently serves as the Secretary of the Company and Board of Directors. Formerly, she was the Vice President of Operations for Mullen Technologies since 2014. We believe that Ms. Winter is qualified to serve as a director because of her business and operational knowledge of Mullen.

53.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Winter made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|-----------------------|--------------|
| October 20, 2023[13] | 556 | $33.9 | $18,848.40 |
| January 25, 2024[14] | 13,334 | $6.78 | $90,174 |

Thus, in total, before the fraud was exposed, Defendant Winter sold 13,890 shares of Company stock on inside information, for which she received approximately $109,022 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

54.     By reason of their positions as officers, directors, and/or fiduciaries of Mullen and because of their ability to control the business and corporate affairs of Mullen, the Individual Defendants owed Mullen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Mullen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Mullen and its shareholders so as to benefit all shareholders equally.

55.     Each director and officer of the Company owes to Mullen and its shareholders

[13] The Form 4 filed with the SEC stated: "Shares amounts and price give effect to 1:100 reverse stock split effected on December 21, 2023 and to 1:100 reverse stock split effected on September 17, 2024. Without giving effect to the reverse stock splits, amount sold was 55,555 shares at $0.339."

[14] The Form 4 filed with the SEC stated: ". Shares amounts and price give effect to 1:100 reverse stock split effected on September 17, 2024. Without giving effect to the reverse stock split, amount sold was 13,334 shares at $6.78."

Verified Shareholder Derivative Complaint

the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Mullen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57.     To discharge their duties, the officers and directors of Mullen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Mullen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

59.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business

prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

60.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Mullen were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Mullen's corporate governance and applicable business practice standards;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Mullen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Mullen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Mullen's operations would comply

with all applicable laws and Mullen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61.    Each of the Individual Defendants further owed to Mullen and its shareholders the duty of loyalty requiring that each favor Mullen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Mullen and were at all times acting within the course and scope of such agency.

63.    Because of their advisory, executive, managerial, directorial, and controlling positions with Mullen, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

64.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Mullen.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.    In committing the wrongful acts alleged herein, the Individual Defendants

have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

67.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Mullen was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the

wrongdoing.

69.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Mullen and was at all times acting within the course and scope of such agency.

## MULLEN'S CODE OF ETHICS AND EMPLOYEE CONDUCT

70.    Mullen's Code of Ethics and Employee Conduct (the "Code of Ethics") states that it "set[s] expectations and provide[s] guidance applicable to all members of the Company's Board of Directors (the 'directors') and officers, employees, independent contractors, and consultants of the Company (all for such purposes of this Code, 'employees')."

71.    In the section "Insider Trading," the Code of Ethics states:

Every employee is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which the Company does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision based on this information. It is illegal, and it is a violation of this Code. Employees who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Company business. Employees must exercise the utmost case when in possession of material nonpublic information.

72.    In the section "Amendment and Waiver," the Code of Ethics states:

Any amendment or waiver of this Code must be in writing and must be authorized by most of the members of the Board or, to the extent permissible under applicable laws, rules and regulations, a committee of the Board if the Board has delegated such authority to a committee. The Company will notify employees of any material changes to this Code. Any such amendment or waiver may be publicly disclosed if required by applicable laws, rules and regulations.

73.    In the section "Financial Integrity; Public Reporting," the Code of Ethics

states, in relevant part:

The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately, and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees, and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosure, the Company requires that:
• no entry be made in the Company's books and records that is intentionally false or misleading.
• transactions be supported by appropriate documentation.
• the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records.
• employees comply with the Company's system of internal controls and be held accountable for their entries.
• any off-balance sheet arrangements of the Company are clearly and appropriately disclosed.
• employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents.
• no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and
• records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the U.S. Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide, or analyze information for or otherwise contribute in any way in preparing or verifying these reports

should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

• no employee may take or authorize any action that would cause the Company's financial records
or financial disclosure to fail to comply with generally accepted accounting principles, the rules, and regulations of the SEC or other applicable laws, rules and regulations.

• all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

• no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information to make the disclosure in any of such reports accurate in all material respects.

• In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

• act honestly, ethically, and with integrity.

• comply with this Code.

• endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC.

• raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed.

• act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

• comply with the Company's disclosure controls and procedures and internal controls over financial reporting.

If an employee becomes aware that the Company's public disclosures are not complete, fair and accurate, or if an employee becomes aware of a transaction

or development that the employee believes may require disclosure, the employee should report the matter immediately.

74.    In the section "Legal Compliance," the Code of Ethics states:

All employees must always obey the law while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that all employees know and understand the legal and regulatory requirements that apply to the Company's business and to their specific area of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. See Section 18 (Compliance Standards and Procedures) for a description of whom to contact with questions about legal compliance.

75.    In the section "Protection and Proper Use of Company Assets," the Code of Ethics states:

All employees are expected to protect the Company's assets and ensure their efficient use for legitimate business purposes. Theft, carelessness, and waste have a direct impact on the Company's business and operating results. Company property, such as computer equipment, buildings, furniture and furnishings, office supplies, products, and inventories, should be used only for activities related to an employee's employment, although incidental personal use is permitted. The Company retains the right to access, review, monitor and disclose any information transmitted, received, or stored using the Company's electronic equipment, with or without an employee's or third party's knowledge, consent or approval. Any theft, misuse or suspected theft or misuse of the Company's assets that becomes known to an employee must be immediately reported.

76.    In the section "Administration Of This Code," the Code of Ethics states:

The Audit Committee is responsible for reviewing this Code as set forth in the Audit Committee's charter and overseeing the establishment of procedures for the prompt internal reporting of violations of this Code. It may request reports from the Company's executive officers about the implementation of this Code and may take any steps in connection with the implementation of this Code as it deems necessary, subject to the limitations set forth in this Code. The Audit

Committee will have the authority to review and assess this Code and recommend revisions for approval by the Board. The Company will notify directors of any material changes to this Code.

77.     In the section "Responsibility for the Investigation," the Code of Ethics states:

The Board is ultimately responsible for the investigation and resolution of all suspected or actual violations of this Code. Alleged violations of this Code will be investigated by the Audit Committee and may result in discipline and other action at the discretion of the Board upon recommendation of the Audit Committee, including, where appropriate, removal from the Board. The Board and the Audit Committee will conduct their investigations with the highest degree of confidentiality that is possible under the specific circumstances. The Audit Chair, the Audit Committee or the General Counsel may consult with other members of the Board and outside counsel as appropriate.

78.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and unjust enrichment, including four Individual Defendants who sold Company stock on inside information. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Mullen's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## MULLEN'S AUDIT COMMITTEE CHARTER

79.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is as follows:

The purpose of the Audit Committee of the Board of Directors (the "Board") of Mullen Automotive, Inc., (the "Company") shall be to:

1. Provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements.

2. Assist the Board in oversight of

a. the integrity of the Company's financial statements,

b. the Company's compliance with legal and regulatory requirements,

c. the independent auditor's qualifications, independence, and performance,

d. the organization and performance of the Company's internal audit function,

e. the Company's internal accounting and financial controls,

f. the Company's treasury and finance matters, and

g. the Company's risk management, including data privacy and security

3. Provide to the Board such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

 In furtherance of these purposes, the Audit Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe.

1.     The Audit Committee's responsibility is one of oversight. The members of the Audit Committee are not employees of the Company, and they do not perform, or represent that they perform, the functions of management or the independent auditors.

2.     The Audit Committee relies on the expertise and knowledge of management, the internal auditor, and the independent registered accounting firm in carrying out its oversight responsibilities. The management of the Company is responsible for preparing accurate and complete financial statements in accordance with generally accepted accounting principles and for establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting.

3.     The independent registered accounting firm is responsible for auditing the Company's annual consolidated financial statements and the effectiveness of the Company's internal control over financial reporting and reviewing the Company's quarterly financial statements.

4 .     It is not the responsibility of the Audit Committee to prepare or certify the Company's financial statements or guarantee the audits or reports of the independent auditors, nor is it the duty of the Audit Committee to certify that the independent auditor is "independent" under applicable rules. These are the fundamental responsibilities of management and the independent auditors.

Verified Shareholder Derivative Complaint

80.    In the section "Responsibilities, Duties and Powers" under the subheading "Review Procedures," the Audit Committee Charter states the responsibilities of the Audit Committee as:

1. Reviewing the reports of management, internal audit and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting, including meeting periodically with the Company's management, internal audit and the independent auditors to review their assessment of the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.
2. Reviewing and providing oversight of the external audit by: reviewing the independent auditors' proposed audit scope and approach.
discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies, disagreements with management and any other required communications described in applicable accounting standards.
reviewing with the independent auditors the Company's critical accounting policies and practices, alternative treatments of financial information within generally accepted accounting principles that have been discussed with management and the treatment recommended by the independent auditors, and other material written communications between the independent auditors and management.
reviewing reports submitted to the audit committee by the independent auditors in accordance with applicable SEC requirements.
3. Reviewing and approving the annual internal audit project plan and any proposed changes and reviewing periodic reports summarizing results of the internal audit projects.
4. Reviewing and discussing with management earnings releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.
5. Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations,"

prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC.

6. Recommending to the Board, if deemed appropriate, that the audited financial statements be included in the Company's Annual Report on Form 10-K, in accordance with the rules and regulations of the SEC.

7. Directing the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews.

8. Conducting a post-audit review of the financial statements and audit findings, including any suggestions for improvements provided to management by internal audit or the independent auditors, and management's response to such suggestions.

9. Reviewing, prior to announcement, Company press releases and other disclosures containing financial information for the purpose of ensuring that such press releases and other disclosures properly disclose financial information presented in accordance with GAAP and, to the extent non-GAAP information is included, adequately disclose how such non-GAAP information differs from the comparable GAAP information and ensure that disclosure of such non-GAAP information is not given undue prominence and that such non-GAAP information does not provide a misleading presentation of the Company's results of operations or financial condition.

10. Discussing guidelines and policies with respect to risk assessment and risk management with the Company's management and overseeing financial risk exposures, including monitoring the Company's financial condition and investments, the integrity of the Company's financial statements, accounting matters, internal controls over financial reporting, the independence of the Company's independent auditor, and guidelines and policies with respect to risk assessment and risk management.

11. Overseeing the Company's annual enterprise business risk assessment, which is conducted by the internal audit function and which includes review of the primary risks facing the Company and the Company's associated risk mitigation measures.

12. Reviewing and approving in advance when possible, or ratifying as soon as reasonably practicable, any related person transactions.

13. Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements.

14. Reviewing insurance coverage.

15. Investigating, or authorizing on its behalf an investigation of, any matter relating to any purpose, responsibility, duty, or power of the Audit Committee

Verified Shareholder Derivative Complaint

set forth in this charter or applicable law, or delegated to the Audit Committee by the Board, and obtaining unrestricted access to the Company's books, records and employees in furtherance of any such investigation.

16. Reviewing its own charter and processes on an annual basis

81.    In the same section, under the subheading "Regulatory Compliance and Other Matters," the Audit Committee Charter states the responsibilities of the Audit Committee as:

1.    Overseeing compliance with the requirements of the SEC for disclosure of auditor's services and audit committee members, member qualifications and activities.

2.    Reviewing management's monitoring of compliance with the US Foreign Corrupt Practices Act and any other similar applicable regulations.

3.    Providing a report for inclusion in the Company's proxy statement in accordance with the rules and regulations of the SEC.

4.    Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

5.    Reviewing and discussing with management the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs.

82.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83.    Mullen is an automotive company focused on producing EVs by working with partners with the aim of offering luxury SUVs, sports cars, cargo vans, and solid-state batteries.

84.    Since the Company's beginnings, Mullen and its officers and directors have repeatedly misled investors with respect to the efficacy of the Company's products and Mullen's growth potential.

85.    For example, Mullen planned on releasing an EV called the DragonFly K50 in 2021, but the DragonFy K50 was actually just a rebranded Qiantu K50. The Qiantu K50 was a luxury sedan EV manufactured by Qiantu out of China in 2015. Mullen and Qiantu announced an agreement for Mullen to release the DragonFly K50 in North America in December of 2018. However, Mullen immediately defaulted on its payment obligations to Qiantu, leading to the termination of the agreement in November 2019. Even after the termination of the agreement, Mullen continued to market the DragonFly K50, renamed as the Mullen K50, on the Company's social media.

86.    Investors began to question Mullen after Hindenburg Research published a scathing report on the Company. On April 6, 2022, Hindenburg Research published a report titled "Mullen Automotive: Yes Another Fast Talking EV Hustle" (the "Hindenburg Report"). The Hindenburg Report first alleged that the Company had falsified reports of tests done on the Company's solid-state batteries. In 2020, the Company announced a joint venture with NextMetals Ltd. to manufacture solid-state batteries. However, the Hindenburg Report revealed that no joint venture ever existed, stating in an interview with a senior executive at NextMetals:

> "It didn't exist at all [the joint venture]. Not a single piece of paper. And he proudly goes and shows the Tweet—and about that time was when [the Nextmetals representatives] did get up and walk out. And [they] said, you know, 'you're nothing but a hustler. You have no substance'…"

87.    The Hindenburg Report detailed that senior executives at NextMetals believed Mullen's vehicles were a "joke":

> And then of course they had a mockup car which had regular batteries in it and was the copy of some car. It was a Chinese sports thing he brought over and dropped some batteries in. A kind of plastic thing. I thought you´re kidding me, this is a joke."

> "They flew in…some typical New York promoters, between New York and Florida…They got extremely nasty and belligerent that [they] didn't need to see the contract and they needed $5 million immediately."

88.    The Hindenburg Report also refuted the test results of the Company's batteries. In an interview with the CEO of the company that purportedly verified the results of the Company's batteries, the CEO stated the following in regard to the Company's claims about the test results:

> "***No we would never have said that. We never did say it and certainly wouldn't have said it based on the results of testing that battery***…but the timing is a little off. EV Grid more or less ceased operations by June or July of 2020 and for the first half of the year it was basically shut down and I was moving out storing stuff in a warehouse because I had this other job at Indi EV. So that makes me think that ***whatever testing we did probably was in 2019 or even 2018.*** That´s my timeline as I recall it."

89.    The Hindenburg Report also contained interviews with Mullen's current battery partner who stated that they were only in the prototype phase of their solid-state battery.

90.    The Hindenburg Report also refuted the Company's claims that the Company would be manufacturing and assembling its vehicles in the United States. Indeed, the Hindenburg Report stated that the Company imported a single model of two Chinese EVs that look nearly identical to Mullen's Class 1 and Class 2 vehicles.

91.    The Hindenburg Report also cast doubts on the Company's ability to begin imminent manufacturing the Class 1 and Class 2 vehicles. It was revealed in the

Hindenburg Report that the Company still did not have compulsory EPA certifications which take at least a year to attain.

92.     The Company stated it had entered a deal with a Fortune 500 company to provide $60 million worth of vehicles. However, the Hindenburg Report revealed that this "Fortune 500 Company" was actually a small cannabis dispensary with one location in a strip mall and a drop-ship location.

93.     The Hindenburg Report questioned the capabilities of the Company's newest manufacturing facility. The Company stated that its Mississippi manufacturing facility contained only $3.4 million in value; however the Company stated that the facility was "fully tooled with state-of-the-art equipment and machinery."

94.     The Hindenburg Report also disclosed the following, in relevant part:

• The company's stock has spiked ~316% in the past couple of months driven by retail investor euphoria over bold claims of ground-breaking technology, near term production of its EV vans, and a major as-yet-unnamed Fortune 500 customer.

• Despite only spending ~$3 million in R&D in 2021, Mullen claims its solid-state battery technology is on track for commercialization in 18 to 24 months, putting it head of every major technology and automaker in the industry who have collectively invested billions on solving the problem.

• Mullen recently press released an update on its battery testing, sending its stock soaring 145% in a day. In reality, the "news" appears to be a rehash of testing the company had already announced in 2020.

• Mullen apparently misrepresented the test results, according to the CEO of the company that performed the tests. Its CEO told us of Mullen's press release: "We never would have said that. We never did say it and certainly wouldn't have said it based on the results of testing that battery."

• Then, on February 28th, 2022 the company made a surprising announcement. Despite spending only $3 million in R&D during its entire fiscal 2021, Mullen claimed it had made progress and "significant advancement'" on development of solid-state batteries, a widely regarded

"holy grail" of the EV battery industry that has long-eluded tech and automaker giants such as Panasonic and Volkswagen. The stock rallied ~145% on the day.

95.    Following the publication of the Hindenburg Report, the Individual Defendants knew that they needed to improve investor confidence in Mullen and did so by making and/or causing the Company to make a series of materially false and misleading statements about the Company's business, operations, and prospects, as discussed in further detail below.

**False and Misleading Statements**

***December 3, 2022 Shareholder Meeting***

96.    On December 3, 2022, the Company hosted a shareholder meeting for investors to vote on: (i) whether to effectuate a reverse stock split; (ii) a switch of Mullen's state of incorporation from Delaware to Maryland; (iii) an increase in the number of allowable shares from 1.3 billion to 5 billion; and (iv) permission to issue new debt and class D shares to fulfill a prior securities agreement. In the Form 8-K the Company filed with the SEC on January 19, 2023 to disclose the results of the shareholder meeting, Mullen stated the following with respect to the proposal to effectuate the reverse stock split:

Proposal No. 1 – The Reverse Stock Split Proposal: An amendment to the Company's Second Amended and Restated Certificate of Incorporation, which amendment will not be filed prior to the later of March 6, 2023 and 180 days after such date (which later date depends on whether Nasdaq Stock Market LLC grants the Company an additional 180-day extension to regain compliance with Nasdaq listing rules), to effect a reverse stock split of our outstanding shares of common stock in an amount not less than 1-for-2 shares and not to exceed 1-for-25 shares, with the exact ratio to be set within that range at the discretion of our Board of Directors (the "**Reverse Stock Split**"); provided, however, that the Company will not file such amendment before May 1, 2023 to effect the Reverse Stock Split unless needed in order to maintain continued inclusion in the Russell 2000, which requires a minimum stock price of $1.00; notwithstanding the foregoing, if Proposal No. 2 is not approved at the Special Meeting, then the Board of Directors may effectuate the Reverse Stock Split at any time, and at such time and date, if at all, as

determined by the Board of Directors in its sole discretion, but no later than December 1, 2023, when the authority granted in this proposal to implement the Reverse Stock Split would terminate.

97.    The proposal for the reverse stock split passed. However, on January 25, 2023, even with approval by the shareholders, the Company announced it "has no plans at the current time to effect a reverse split." Thus, the statements Defendants made at the shareholder meeting in the preceding paragraph with respect to the reverse stock split were false and misleading, as the Company did not actually intend to effect the reverse stock split.

98.    The Company had until March 6, 2023 to reach the NASDAQ $1.00 minimum bid requirement, and if Mullen's stock did not reach this requirement, the Company planned to seek an extension from NASDAQ to meet it. If NASDAQ approved such an extension, the Company's deadline to comply with the requirement would be extended 180 days until September 6, 2023.

99.    Defendant Michery was seemingly in favor of the reverse stock split, as evidenced by his purchase of a single share of Class AA preferred stock. This share cost $25,000 and came with 1.3 billion votes. In discussing the transaction, marketbeat.com reported that "*[t]he factor that points to Michery's favoring the reverse split is that his share is immediately redeemable for cash upon the passage of the proposal.*"[15] It also reported that Defendant Michery and Mullen filed a notice of the Cancellation of the Certificate of Designation of Series AA Preferred Stock "after it had been automatically redeemed for cash and served its purpose in voting to pass the proposals related to the first reverse stock split."

### March 6, 2023 Press Release

100.    On March 6, 2023, the Company published the March 6th Press Release, announcing that the Company had partnered with RRDS, a leader in small business federal

---

[15] All emphasis has been added unless otherwise noted herein.

contractors. The March 6th Press Release stated that Mullen "currently holds a prime seat on 12 Indefinite Delivery/Indefinite Quanity (IDIQ) federal contracts with combined funding ceilings of $4 billion." The March 6th Press Release further stated the following, in relevant part:

> BREA, Calif., March 06, 2023– via InvestorWire – **Mullen Automotive, Inc.** (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, **announces today teaming up with Rapid Response Defense Systems ("RRDS") to fast-track U.S. Federal Government opportunities for potential large-scale vehicle fleet orders.**
>
> **RRDS, one of the country's leading small business federal contractors, has executed over 2,500 federal government delivery orders since 2014.** The company currently holds a prime seat on 12 Indefinite Delivery/Indefinite Quantity (IDIQ) federal contracts with combined funding ceilings of $4 billion. In 2021, U.S. Secretary of Labor Martin J. Walsh recognized RRDS as a recipient of the 2021 HIRE Vets Medallion Award during an award ceremony at the U.S. Department of Labor.
>
> "RRDS is all about providing solutions to the federal government," said Mullen's Manager of Government Sales Ronald Dixon. "Whether its designing products to meet Department of Defense mission requirements or enhancing supply chain logistics, they have a remarkable success record. In addition, RRDS will be a key vehicle supplier to the General Service Administration in an awarded 5-year multibillion-dollar vehicle contract. We are focused on selling our EV products to the federal government and view this relationship as a strategic step in accomplishing that goal."
>
> **"With the federal government's strong interest in electrifying a growing portion of its vehicle fleet, Mullen's commercial portfolio is very well positioned,"** said RRDS SVP – Federal Fred Bouman. "Mullen's Class 1 EV cargo van launches this year and will be the only class 1 EV van in the market. It is 100% electrified, making it a strong fit for federal government business."
>
> "**Mullen Automotive is proud to team up with RRDS for U.S. government fleet opportunities for our Class 1 EV cargo vans**," said Mullen's CEO and Chairman David Michery. "**We look forward to working closely with RRDS in meeting the demand for EVs across the U.S. government's fleet of vehicles**."

101.    The statements in the aforementioned paragraph were materially false and misleading because they failed to disclose, *inter alia*, that: (1) a final ruling and compliance needed to be issued by the GSA, instead of U.S. Customs and Border Protection ("CBP"); (2) Mullen was not on the "fast-track" to achieve opportunities for large-scale vehicle fleet orders from the U.S. government; and (3) upon information and belief, the Company has not properly submitted the requisite information required for Mullen to participate or receive a benefit from government contracts with Mullen or RRDS.

### April 18, 2023 Press Release

102.    On April 18, 2023, the Company published the April 18th Press Release. The April 18th Press Release announced a joint venture between Mullen and Global EV Technology, Inc. called Mullen Advanced Energy Operations, LLC ("MAEO"), which would purportedly advance energy management technologies, beginning with electronic vehicles and then reaching other energy applications. The April 18th Press Release stated that Mullen would own 51% of MAEO and that the Company would provide the capital while Global EV Technology, Inc. would provide the technology. In relevant part, it stated that: "Under the newly formed entity, Mullen owns 51% and will consolidate the results of its operations in Mullen Automotive, Inc. Under the agreement between the parties, Global EV Technology will be contributing its technology and existing contracts to MAEO, and Mullen will provide capital, execution, and commercialization to grow the business."

103.    The April 18th Press Release further stated the following:

Both companies will be contributing and working together on **known verified technology** for improving existing vehicle performance and extending battery range. As **this technology has immediate and key implications for electric vehicles**, MAEO's initial development is focused on improving Mullen's lineup of commercial and consumer EVs.

104.    With respect to Global EV Technology Inc.'s founder and Chief Scientific Officer, Hardge, the press release stated the following, in relevant part:

The founder of Global EV Technology Inc., and chief scientific officer, Lawrence Hardge, is a successful life-long inventor with a storied career of

over 30 yrs. Lawrence's accomplishments include the following:

- Holds over 120 intellectual prototypes as well as numerous patents and trademarks.

- Inventor of Knock Out 360 Fire Extinguisher. One of the only extinguishers in the U.S. market that is UL approved for use in electric vehicle fires.

- Featured in various magazines, including Barron's.

- Received Spirit Award from the Detroit City Council for providing Knock Out 360 Extinguishers to local residents.

- Lifelong resident of his hometown, Vicksburg, Mississippi, with a dedicated focus on helping his community.

- Provided scholarships to high school students who achieved honor roll status, who otherwise could not afford to attend college, as well as provided clothing, computers, housing, and utilities.

- Honored by the town of Vicksburg for black history month.

105.    The April 18th Press Release also commented on Hardge's past, stating: "In the late 90s, Lawrence was convicted of a state crime, which was ultimately expunged. Despite these challenges, Lawrence focused his energy and attention on his natural gift for inventions related to electrical equipment and batteries and has dedicated his career to bringing them to market."

106.    The press release quoted Hardge, who stated: "My partnership with Mullen is very important to help scale this energy technology and bring it to our existing and future customers[.]" In addition, the press release quoted Defendant Michery, who stated, *inter alia*, that "Lawrence is a talented inventor, and we are excited to begin working with him on improving electric vehicle performance" and that "[w]e are always looking for forward-thinking and ground-breaking technology opportunities and are pleased to partner with Global and EV Technologies."

107.   Notably, the April 18th Press Release was false and misleading because it failed to disclose, *inter alia*, that the Defendants knew or should have known about Harge's previous convictions for financial crimes and disclosed such information to shareholders. Indeed, as was later revealed in the July WUSA9 Report, **"*Court documents show Hardge was sentenced to 26 years in prison for a felony conviction in 2001. He was found guilty of selling unregistered securities from his home state of Mississippi. Hardge served five years in prison and tried to expunge, or wipe, his criminal record in 2021. A Mississippi judge rescinded Hardge's temporary felony expungement in March 2022, after a judge's order shows allegations surfaced that Hardge used business investor's money to repay the people he defrauded in 2001.*"**

108.   Following the issuance of the press release, the Company's share price closed at a price 25% higher than the previous reporting day.

***April 20, 2023 Press Release***

109.   Two days later, the Company issued a press release (the "April 20th Press Release") to announce the first test results of the MAEO battery. In relevant part, the April 20th Press Release stated:

> ***Mullen Automotive, Inc.*** (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, ***today announces test results of its recently acquired joint venture technology, greatly improving current EV performance by increasing EV vehicle range.***
>
> - ***Element Materials Technology test results indicate that the Energy Management Module ("EMM") technology substantially increases the driving range and efficiency of any current EV battery.***
>
> - Specific vehicle testing of a high-volume OEM electric vehicle by Element resulted in a calculated increase in range from 269 to 431 miles, which is a 60% increase in efficiency.
>
> - EMM technology was also tested by Mullen Automotive engineers on the Company's Class 1 EV Cargo Van at its Troy, Michigan, facility. Results showed more than a 75% increase in range for the 42-kWh lithium-ion

battery pack, which would be a calculated EPA estimated range of 186 miles at a very low added cost and mass.

- EMM technology is being integrated into final stages of product development and is planned to be introduced in all Mullen commercial and consumer vehicle programs.

- U.S. provisional patent application has been filed covering the technology.

- Mullen Automotive owns 51% of MAEO, LLC and will consolidate the results of its operations in Mullen Automotive, Inc. (NASDAQ: MULN)

110.   The press release quoted Harge, who stated: "We have tested EMM technology in various vehicle applications and have repeatedly seen significant improvements in range. I am extremely pleased to partner with Mullen for the commercialization and global availability of the EMM technology[.]"

111.   In addition, the press release quoted Defendant Michery, who stated, *inter alia*, that "[s]eeing the previous EMM test results conducted by Element, along with Global EVT testing, and correlating that with testing by our engineers, we believe this technology is a perfect fit for Mullen's EV product lineup as well as the advancement in EV technology for the overall automotive industry." The April 20th Press Release also indicated that MAEO was "plan[ning] on licensing this technology to anyone who uses an electric vehicle."

112.   The aforementioned statements were materially false and misleading because, as was later revealed, the Company's battery technology did not have the capabilities that Defendants repeatedly touted during the Relevant Period. Moreover, the statements failed to disclose Hardge's checkered past.

### *April 20, 2023 Facebook Live*

113.   On April 20, 2023, Hardge went on Facebook Live to announce that Mullen had entered into a deal worth $10 billion with Saudi Arabia. Hardge specifically stated the following, in relevant part:

*This is not what somebody said or what you heard, this is reality. $10 billion contract with Saudi Arabia. And more to come* … Mullen and Lawrence Hardge are here to assist them, they have countries like Yemen, Israel, all of them have joined in to take this technology, and they're going to produce it in Saudi Arabia and they're also paying for a manufacturing plant to come to Michigan.

114.   In relevant part, Hardge also posted the following on Facebook, together with an image of Mullen's company logo:

I accept my New Position as Senior Vice President.
I am also proud to see the job creations in Tunica, Ms. My Home state.
Time to shut these naysayers down.
Stay Tuned For the Real Deal Holyfield as my buddy would say.
*Representatives from my team have been in Saudi since last week Friday working on bringing the Saudi Deal to fruition.*
*I represent facts. This is my story and I stand behind it.*

115.   Hardge later reiterated these claims on another Facebook Live stating:

three deals in the Middle East…This is tentative. *We already committed, the deals are committed, so nobody can back out…Several multi-billion-dollar deals coming out of the Middle East, some that's coming out of Asia.*

116.   These statements were materially false and misleading because, as Defendant Michery later admitted, the Company was not involved in the Saudi deals, and thus the purported "contract" would never benefit the Company or its stock.

*May 3, 2023 Reverse Stock Split*

117.   On May 3, 2023, the Company announced that "it will effect a 1-for-25 reverse stock split ('Reverse Stock Split') of its common stock, par value $0.001 per share ('Common Stock'), that will become effective on May 4, 2023, at 12:01 a.m., Eastern Time. Mullen's Common Stock will continue to trade on The Nasdaq Capital Market ('Nasdaq') under the existing symbol 'MULN' and will begin trading on a split-adjusted basis when the market opens on May 4, 2023.

*May 15, 2023 Press Releases*

118.   On May 15, 2023, following the reverse stock split, the Company issued a press release to "announce[] a business update to its shareholders." The press release announced that "[o]n January 20, 2023, *Energy Management Module ('EMM') technology was tested by Hardge and Mullen engineers on the Company's EV Cargo Van at its Troy, Michigan, facility, with testing results showing an increased battery capacity of 44%*."

119.   The same day, the Company, through a separate press release, "issue[d] an update on the pilot program contract for installation of Energy Management Modules ('EMM') on Washington, D.C., city government's fleet of vehicles." The press release represented that the contract with Washington D.C. was worth $680,000; that it "was previously awarded by the District of Columbia, Washington, D.C., to EV Technologies, LLC. for the purchase and installation of EMM units on Chevrolet Bolts within the D.C. city government's vehicle fleet."; and that MAEO was now "supporting EV Technologies for the execution of the contract, which started on April 24, 2023."

120.   The press release further stated the following, in relevant part:

MAEO, which is a 51%-owned subsidiary of Mullen Automotive, is a collaboration with Global EV Technology, Inc. ("Global").

MAEO has named Lawrence Hardge to the position of Senior Vice President of Technology. Lawrence will be overseeing all technological aspects of the Energy Management Module ("EMM") applications.

"We look forward to completing our installation work here in D.C., and the next steps as vehicles enter the fleet with our EMM and also future opportunities with the local and federal government agencies," said Lawrence Hardge, CEO of EV Technologies, LLC.

"As testing and installations continue in D.C., we will provide further updates," said David Michery, CEO and chairman of Mullen Automotive.

121.   The press release was false and misleading because it failed to disclose, *inter alia*, that: the Defendants knew or should have known about Harge's previous convictions

for financial crimes and disclosed such information to shareholders. Indeed, as was later revealed in the July WUSA9 Report, **"*Court documents show Hardge was sentenced to 26 years in prison for a felony conviction in 2001. He was found guilty of selling unregistered securities from his home state of Mississippi. Hardge served five years in prison and tried to expunge, or wipe, his criminal record in 2021. A Mississippi judge rescinded Hardge's temporary felony expungement in March 2022, after a judge's order shows allegations surfaced that Hardge used business investor's money to repay the people he defrauded in 2001.*"** Moreover, the press release failed to disclose that Mullen's battery technology did not have the advanced capabilities that Defendants repeatedly touted to investors.

### May 15, 2023 Letter Agreement

122.    On May 15, 2023, the Company entered into a Securities Purchase Agreement (the "May 15th Letter Agreement") with Esousa Holdings delaying the purchase of the Company's common stock worth $45,000,000 to June 12, 2023. The May 15th Letter Agreement was false and misleading because it failed to disclose Wachs's criminal past where he defrauded Chase Manhattan Bank for $20 million and was permanently banned from FINRA, NASD, and the board of governors of the Federal Reserve.

### November 27, 2023 Press Release

123.    On November 27, 2023, the Company issued a press release providing an update on their partnership with RRDS. The November 27 Press Release stated that the Company and RRDS had filed responses for a final ruling and compliance by the U.S. Customs and Border Protection ("BBP").

124.    The November 27 Press Release further stated that "Upon a successful ruling, Mullen will have demonstrated the commitment it has made to growing the EV market in the U.S."

125.    The statements in the aforementioned paragraphs were materially false and misleading because they failed to disclose, *inter alia*, that: (1) a final ruling and compliance

needed to be issued by the GSA, instead of CBP; and (2) upon information and belief, the Company has not properly submitted the requisite information required for Mullen to participate or receive a benefit from government contracts with Mullen or RRDS.

### **The Truth Begins to Emerge as the False and Misleading Statements Continue**

#### *June 6, 2023 Announcement*

126.    The truth began to emerge on June 6, 2023, when, after having received the benefit of the stock bump, Defendant Michery announced that Mullen would not be participating in the $10 billion deal with Saudi Arabia previously announced by Hardge in April 2023. Notably, Defendant Michery revealed the following, in relevant part:

> "I've never reviewed any Saudi deals nor am I familiar with the deals, and to be clear if anyone were interested they could defer to the agreements that we executed that act as the definitive agreements until superseded by subsequent operating agreements and they are not cancelable unless we mutually agree to terminate the relationship which we've not done.
>
> *As it relates to the Saudi Deal, it's carved out.*
>
> *We gave him that, so I don't understand why he would say that he provided us that deal to look at when he has that as a carve out in the agreements that we filed with the SEC.*
>
> *He does have a carve out and we gave him that territory as an exclusion, so we don't really have any rights to it, nor do we care.*
>
> So, you know, there'd be no reason for us to look at any agreements that he has between the Saudi's, or the alleged Saudi's.
>
> We don't care one way or the other. *So, I want to be clear about that. I've never reviewed any documents. He's never provided any documents about any Saudi Arabian deal.*
>
> *The only documents that I've ever reviewed were documents with the District of Columbia or the installation of the units into Chevy Bolts. Those are the only documents we've reviewed."*

127.    The Individual Defendants had concealed this information from investors for

almost two months, notably failing to disclose it in the Company's April 18th Press Release
which discussed Mullen's dealings with Hardge.

128.    Defendant Michery said that the Saudi Arabia deal would have "no impact"
on Mullen.

### Jalopnik Report

129.    The truth continued to emerge on June 8, 2023, with the release of the Jalopnik
Report. The Jalopnik Report revealed the misleading nature of the claims by Global EV
Technology, Inc. Global EV Technology, Inc. purported to have a device that could extend
the battery life of "top EVs" by 500 to 700 miles. However, the Jalopnik Report found the
testing methods misleading, stating:

> The results of the testing mysteriously disappeared, but I managed to find
> them: buried in the pictures on Hardge's Facebook profile are two pages of
> what's supposed to be a 14-page report. If you look closely you'll see that the
> main details left out of both the description of the Ever-Charge Technology
> and its release announcement were that the test was performed using a GEM
> E6, one of those small golf cart like EVs retirees use down in Florida.

> It wasn't performed on a "top EV" as the description mentions. The test was
> also done without the drive wheels touching the ground. Basic science tells us
> that low rolling resistance and a lighter load on the battery are going to mean
> a higher range. But this all just points to the testing being purposely presented
> as misleading. I reached out to Global EV Technology to see if they could
> explain their tech a bit more and was met with silence.

### Investorplace Report

130.    On June 20, 2023, Investorplace released a report stating that the relationship
between the Company and Hardge had deteriorated. The Investorplace Report detailed that
Hardge had previously alluded to walking away from the MAEO deal, stating "I don't have
nothing to hide. Every day people walk away from deals. They don't work out, life goes
on, they move on."

131.    The Investorplace Report further reported that Defendant Michery and Hardge

had not spoken in weeks, with Hardge stating, "But I can't speak on David, we don't talk. But I can tell you this here: I didn't sign up for this." The report also detailed an interview that had been conducted earlier in the month with Defendant Michery, where he stated the following, in relevant part:

> *"So, we sent [Lawrence Hardge] definitive agreements, which are the operating agreements and all of the agreements that would underline operating MAEO that went to his current lawyer, the Calhoun Law Firm, and we obviously submitted those documents for review. They submitted those documents to Lawrence and then contacted us towards the end of May to tell us that they were terminated by Lawrence, which we found to be interesting, to say the least."[16]*

### June 21, 2023 Press Release

132.    The truth continued to emerge on June 21, 2023 when the Company announced by press release "an investor financing moratorium for the balance of 2023." In the press release, Defendants attempted to reassure investors, representing that, even though there had been steep declines in the Company's share price, the Company had met or was positioned to meet its objectives.

133.    The press release stated:

> Remaining investor option expires on June 30, 2023. Company assets are unencumbered with the exception of $7.3 million outstanding debt.
>
> The Company continues to trade at a steep discount to its current cash position of $135 million or $0.38 per share as of June 13, 2023. As of its most recently filed Form 10-Q on March 31, 2023, the Company's book value was $2.08 per share.
>
> **Since March 31, 2023, the Company's stock has declined over 95% from $3.25 per share to $0.16 per share on June 20, 2023. The Company's common stock trades at a discount to our cash value per common share of $0.38 as of June 13, 2023.**
>
> **Despite the decline in stock price, management believes the Company has**

---

[16] Emphasis in original.

*already met or is positioned to meet the previously announced objectives.*

As per the Company's last reported financial position on March 31, 2023, it had $86.7 million of cash available for operations and $0.68 of cash value per share. Mullen's book value per share was $2.08 on March 31, 2023. ***The Company has sufficient capital on hand for at least the next 12 months.***

The Company would like to highlight two completed acquisitions that added valuable, unencumbered assets to the balance sheet totaling $253 million for majority ownership in Bollinger Motors and certain assets related to Electric Last Mile Solutions ("ELMS").

134.   The aforementioned statements were materially false and misleading and failed to disclose that Mullen did not have sufficient capital on hand for at least the next 12 months, largely due to the fact that Defendants had repeatedly entered into partnerships with individuals who had previously been convicted of fraudulent activity. When the truth regarding these partnerships came to light, the Company suffered the fallout, which impacted its financial results.

### Fastcompany Report

135.   The truth continued to emerge on July 5, 2023 when Fastcompany released its report revealing the specifics of Hardge's criminal past.

136.   The Fastcompany Report stated the following, in relevant part:

In 2021, an inventor named Lawrence Hardge convinced the CEO of a Tennessee medical company to invest a hefty sum of money into his "Black Box Technology," an energy system he said would revolutionize electric car batteries. He vowed it could triple vehicle performance, and better yet, regenerate power without being plugged in. Essentially, he was touting a perpetual-motion machine, and argued he only needed $300,000 to complete it.

What the investor, Roger Biles, didn't know was that back in 2001, Hardge had been convicted of eight counts of securities fraud, sentenced to 20 years in prison, and ordered by the state of Mississippi to pay fines and restitution equaling $291,497.31. Two days after Biles' funds cleared, Hardge paid back what he owed using the same account where that capital had been deposited, according to documents Biles later introduced in court. Satisfied that Hardge

had repaid his legal debt to society, the state granted his request to expunge his felony criminal record. It might have stayed expunged, too—except Hardge allegedly bragged about his scheme immediately, leading the court to rescind his expungement order one month later.

Biles contends, in a lawsuit now being heard in a Tennessee court, that he was defrauded "in a fashion similar to the acts for which Hardge was originally convicted"—which include not just embezzling money, but also refusing to pay $105,000 for Biles' electric Porsche that was negotiated into the deal.

* * *

To capitalize on the attention, Mullen touted new deals it swore were forthcoming, going so far as to claim that some, such as Hardge's battery technology, would upend the industry.

In its initial press release announcing the partnership with Hardge, the company included a strangely vague acknowledgment: "In the late '90s, Lawrence was convicted of a state crime, which was ultimately expunged." It's known now that this was patently untrue. The question is, what did Mullen know in April? Did it fail to conduct due diligence on a major business partner? Did it ask Hardge and he lied? Or was Mullen aware that Hardge's felony conviction was "expunged" for a mere 10 months and then reinstated?

137.   The Fastcompany Report also questioned the Company's battery technology, stating:

It has also unleashed a wider scandal, one that could implicate an emerging California electric carmaker—Mullen Automotive—whose soaring popularity in the world of meme stocks is owed at least in part to a partnership it forged with Hardge.

In April, Mullen and Hardge announced joint venture to install his supposedly self-regenerating battery technology in its electric vehicles, then scale it to golf carts, drones, wheelchairs, e-bikes, anything electric—a veritable game changer worth billions, if it existed. Mullen's shares enjoyed a 24% bump within one day as investors swooped in, dreaming of their own massive, Tesla-style payday. But just months later, a growing number of investors are now doubting if Hardge's device was real, asking if Mullen ever even believed it was, and wondering if that duo has simply taken them all for a ride.

***July 10, 2023 Form 8K***

138.   The truth continued to emerge on July 10, 2023 when the Company

announced on a Form 8-K filed with the SEC (the "July 10th Form 8-K") that it had
terminated the joint venture with Global EV Technologies, Inc. In relevant part, the July
10th Form 8-K stated:

> On July 10, 2023, Mullen Automotive Inc. (the "Company" or "Mullen"),
> issued a termination notice to Lawrence Hardge and the following entities
> Global EV Technology, Inc. and EV Technology, LLC (collectively, "EVT")
> terminating the Agreement dated April 17, 2023  between the Company and
> EVT. Pursuant to the Agreement, the parties agreed to jointly form and
> organize Mullen Advanced Energy Operations ("MAEO") to develop,
> manufacture, market, sell, lease, distribute and service all products resulting
> from a device that is designed to extend the effective battery life (the
> "Technology") and EVT would agree to license to MAEO the Technology
> and all intellectual property rights relating to the Technology.
>
> ***The termination notice, which was sent after numerous attempts by the
> Company  to obtain adherence by EVT to the terms of the Agreement,
> references several breaches by EVT including (1) failing to execute
> documents evidencing an irrevocable, royalty free, worldwide exclusive
> license to the Technology and IP, in perpetuity, to MAEO, (2) refusing to
> conduct any tests of the Technology at a Mullen approved facility after the
> LOA, (3) repeatedly refusing to honor the terms of the Mutual Non-
> Disclosure Agreement signed April 14, 2023, and (4) failing to disclose all
> claims or threatened legal actions by any third parties related to the
> Technology.***

### *July 17, 2023 WUSA9 Report*

139.   The truth continued to emerge on July 17, 2023, when WUSA9 issued a
scathing report casting more doubts on the battery technology of the Company, titled
"Convicted felon gets DC contract to install car battery tech called impossible by experts."

140.   The July 17th WUSA9 Report stated:

Lawrence Hardge, sentenced to 26 years in prison in 2001, claims his
invention can double the battery range of electric vehicles.

***

Self-described inventor Lawrence Hardge created a small box to be installed
into D.C.'s parking enforcement vehicles. ***Electrical engineers say this***

1     *product is untested and practically impossible.*

2                  \*\*\*

*Hardge won't provide any pictures or diagrams of the device he claims to have created, but WUSA9 found a depiction on company news release posted on a federal website. It appears to be a black box that can be handheld with black and red wires coming from it. Hardge claims it will double the range of D.C.'s parking enforcement electric vehicles by doing what he calls "rejuvenating the battery."*

WUSA took those claims to the electrical engineering labs at the University of Maryland.

*"There's not technologies that I'm aware of that can really boost that same battery pack to significantly more than 200 mile range," said Paul Albertus, associate director of the Maryland Energy Innovation Institute. "There's a variety of limitations just from basic chemical theory. There's only so much energy you can store for the materials that you put into a battery."*

UMD's experts add that any experimental ways to slightly re-energize a battery involve breaking it open, not wiring a box to it as Hardge claims he can do.

WUSA also told General Motors, maker of the Chevy Bolts, what Hardge is working on and asked what they know about his claims.

*"We have not been involved in this project and are not aware of this specific technology," General Motors wrote in a statement.*

     141.   The July 17th WUSA9 Report also discussed Hardge's criminal past, stating the following, in relevant part:

Court documents show Hardge was sentenced to 26 years in prison for a felony conviction in 2001. He was found guilty of selling unregistered securities from his home state of Mississippi. Hardge served five years in prison and tried to expunge, or wipe, his criminal record in 2021. A Mississippi judge rescinded Hardge's temporary felony expungement in March 2022, after a judge's order shows allegations surfaced that Hardge used business investor's money to repay the people he defrauded in 2001.

*WUSA9 asked the D.C. government whether it knew that Mississippi court records consider Hardge a convicted felon before it signed a contract with him.*

*A spokesperson with DC Office of Contracts and Procurement responded that the department wasn't aware of that until the day WUSA9 informed them and that it is "actively investigating the situation."*

142.    The July 17th WUSA9 Report also revealed the following:

Six weeks after we alerted DC about Hardge and his claims, on July 13, DC government told WUSA9 it "terminated" the contract due to "violations of terms of the agreement." It added DC would not pay Hardge any money.

***August 7, 2023 WUSA9 Report***

143.    The truth continued to emerge on August 7, 2023, when WUSA9 issued a follow up report after Hardge disputed some of the claims in the July 17th WUSA9 Report.

144.    In the August 7th WUSA9 Report, Hardge was quoted as stating the following:

What I created was simple. Nobody thought of it. I filed a patent on it, okay. What I created instead of having a combustible, alternator, I created an all-electric battery, and it is an energy management system. Basically what it is, sir, is the all-electric generator. I've taken the old battery energy, design a generator, where you see the box, my system is plugged in the box, which is an all-electric generator. And that's why I beat out everybody in the world.

145.    The August 7th WUSA9 Report further disputed Hardge's claims regarding the Company's battery capabilities, stating:

We took Hardge's claims to Paul Albertus, PhD, an electrical engineer at the University of Maryland: "So there's extensive research and development to develop new battery chemistries that are improvements on lithium ion that have a longer range. There's not technologies that I'm aware of that can really boost that same battery pack to significantly more than 200 mile range. There's a variety of limitations just from basic chemical theory. There's only so much energy you can store for the materials that you put into a battery, and there's a little bit of flexibility in that."

***

Second, WUSA9 asked Hardge for the certified test results he claims reported his technology works. ***Paperwork he gave us show Hardge paid Element labs of Michigan to put his modified car through some mileage tests. But the lab came to no conclusion, writing "to be determined by Hardge Global Technologies, LLC."*** Hardge provided no testing reports coming to an independent conclusion that agreed with his claims.

146.   The August 7th WUSA9 Report further discussed Hardge's criminal past, stating:

> ***First, Hardge claims that his felony record for illegally selling stocks in 2001 was expunged, or wiped, when entering into a contract with DC government. We obtained a judge's order rescinding that expungement after allegations surfaced that Hardge used business investor's money to repay the people he defrauded in 2001. It's dated March 2022. The DC contract was awarded February 2023. Hardge was a felon convicted of business crimes during the DC contract and remains so.***

***November 24, 2023 Press Release***

147.   On November 24, 2023, the Company published a press release to update investors on the RRDS partnership. In relevant part, the press release stated that the Company and RRDS "***have filed responses for final ruling and compliance by the U.S. Customs and Border Protection ('CBP') application for Mullen's Class 1 EV cargo van***."

148.   The statements in the aforementioned paragraph were materially false and misleading because they failed to disclose, *inter alia*, that a final ruling and compliance needed to be issued by the GSA, instead of CBP; and (2) upon information and belief, the Company has not properly submitted the requisite information required for Mullen to participate or receive a benefit from government contracts with Mullen or RRDS.

***November 27, 2023 Press Release***

149.   On November 27, 2023, the Company published another press release to discuss the RRDS partnership. In relevant part, the press release stated:

> On behalf of Mullen, RRDS filed the Ruling Request Application, which details the substantial transformation Mullen completed for the Class 1 EV

cargo van to meet U.S. Federal Motor Vehicle Safety Standards and Environmental Protection Agency regulations, including the design, testing and validation of new safety systems including airbags, sensors and control modules, rearview camera, front bumper system, wiring harnesses and seating. By successfully completing the substantial transformative process, the Mullen ONE will be defined as a U.S.-made end product.

150. The statements in the aforementioned paragraph were materially false and misleading because they failed to disclose, *inter alia*, that upon information and belief, the Company has not properly submitted the requisite information required for Mullen to participate or receive a benefit from government contracts with Mullen or RRDS.

## **THE TRUTH FULLY EMERGES**

### *March 13, 2024 Press Release*

151. The truth fully emerged on March 13, 2024 when the Company announced by press release an update with the partnership with RRDS. The March 13th Press Release stated that the CBP informed the Company that final determination on the ruling request for the government contract needed to be issued by the GSA. The March 13 Press Release further stated that the Company and RRDS were now proceeding with the GSA to finalize qualification of Mullen to sell Class 1 EV cargo vans to all branches of the U.S. government. In relevant part, it stated:

On March 5, 2024, U.S. Customs and Border Protection informed Rapid Response Defense Systems ("RRDS") counsel that a final determination on the ruling request needs to be issued by the U.S. General Services Administration ("GSA").

Based on CBP advice, Mullen and RRDS are now proceeding with the GSA in order to finalize qualification of Mullen to sell Class 1 EV cargo vans to all branches of the U.S. government.

"Mullen is well positioned to support the U.S. government's goal of transitioning its fleet to electric vehicles," said David Michery, CEO and chairman of Mullen Automotive.

152. On this news, Mullen's stock price fell $0.002 per share, or almost 12%, to

close at $0.15 per share on March 13, 2024.

## Subsequent Developments

153.   Since the end of the Relevant Period, Defendants have continued to make false and misleading statements regarding, *inter alia*, the purported deals that Mullen had entered into with Esousa Holdings and Volt Mobility.

### *May 21, 2024 Stock Purchase Agreement*

154.   On May 15, 2024, the Company entered into a stock purchase agreement (the "May Purchase Agreement") with Esousa Holdings. The May Purchase Agreement stated that Esousa Holdings agreed to purchase from Mullen, at Mullen's discretion from time to time, from the effective date of the registration statement and until the earlier of (i) the 36 month anniversary of the Commencement Date or (i) the termination of the May Purchase Agreement in accordance with the terms thereof, shares of Mullen's common stock, having a total maximum aggregate purchase price of $150,000,000. The Company failed to disclose material information that Wachs had pled guilty in 1997 to defrauding Chase Manhattan Bank for $20 million and that Wachs had received a lifetime ban from FINRA, NASD, and the board of governors of the Federal Reserve.

### *August 26, 2024 X Post*

155.   Defendant Michery posted on X that Volt Mobility were to have 3,000 Class 1 & 3 EV cargo vans assembled at the Company's Mississippi facility.

### *August 27, 2024 Stock Purchase*

156.   Pursuant to the May Purchase Agreement, Esousa purchased 13,816,105 shares of the Company's stock. The Company failed to disclose material information that Wachs had pled guilty in 1997 to defrauding Chase Manhattan Bank for $20 million and that Wachs had received a lifetime ban from FINRA, NASD, and the board of governors of the Federal Reserve.

### *January 23, 2025 Stock Purchase Agreement*

157.   On January 23, 2025, the Company announced it had entered into a securities

purchase agreement with Esousa and JADR whereby ESOUSA and JADR purchased an aggregate principal amount of approximately $6.3 million of 5% Original Issue Discount Secured Notes convertible into shares of Common Sock and five-year warrants exercisable on cash basis for 32,388,664 shares of common stock. The Company failed to disclose material information that Wachs had pled guilty in 1997 to defrauding Chase Manhattan Bank for $20 million and that Wachs had received a lifetime ban from FINRA, NASD, and the board of governors of the Federal Reserve.

### March 20, 2025 Form 8-K

158.   On March 20, 2025, the Company filed a Form 8-K with the SEC announcing that it had terminated the deal with Volt Mobility.

## DAMAGES TO MULLEN

159.   As a direct and proximate result of the Individual Defendants' conduct, Mullen has lost and will continue to lose and expend many millions of dollars.

160.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

161.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

162.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

163.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who

breached their fiduciary duties to the Company.

164.   As a direct and proximate result of the Individual Defendants' conduct, Mullen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

165.   Plaintiff brings this action derivatively and for the benefit of Mullen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Mullen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

166.   Mullen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

167.   Plaintiff is, and has been at all relevant times, a shareholder of Mullen. Plaintiff will adequately and fairly represent the interests of Mullen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

168.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

169.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Mullen's Board consisted of the following seven individuals: Defendants Michery, Andersen, Betor, Miltner, Novoa, Puckett, and Winter (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Director-Defendants that were on the Board at the time this action was filed.

170.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of

the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

171. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Mullen to issue materially false and misleading statements. Specifically, the Director-Defendants caused Mullen to issue false and misleading statements which were intended to overestimate the strength of Mullen's partnerships with MAEO and RRDS and which further overstated the Company's battery technology. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

172. Additional reasons that demand on Defendant Michery is futile follow. Defendant Michery has served as Chairman of the Board and as CEO of the Company since November 2021. The Company provides Defendant Michery with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Michery is a defendant in the Securities Class Action. Defendant Michery has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein,

with personal proceeds of approximately $6.3 million. For these reasons, too, Defendant Michery breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Andersen is futile follow. Defendant Andersen has served as a Company director since September 2022. He also serves as a member of the Audit Committee and a member of the Compensation Committee. In addition, Defendant Andersen receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Andersen has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, netting personal proceeds of approximately $189,202. For these reasons, too, Defendant Andersen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Betor is futile follow. Defendant Betor has served as a Company director since November 2021. He also serves as a member of the Audit Committee and Compensation Committee and as Chair of the Nominating & Governance Committee. In addition, Defendant Betor receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Betor breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175. Additional reasons that demand on Defendant Miltner is futile follow. Defendant Miltner has served as a Company director since November 2021. In addition, Defendant Miltner receives handsome compensation from the Company for his role as a director. The Company admits Defendant Miltner is a non-independent director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Miltner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176. Additional reasons that demand on Defendant Novoa is futile follow. Defendant Novoa has served as a Company director since July 2022. In addition, Defendant Novoa receives handsome compensation from the Company for his role as a director. The Company admits that Defendant Novoa is a non-independent director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Novoa breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177. Additional reasons that demand on Defendant Puckett is futile follow. Defendant Puckett has served as a Company director since November 2021. He also serves as Chair of the Audit Committee, Chair of the Compensation Committee, and as a member of the Nominating & Governance Committee. In addition, Defendant Puckett receives handsome compensation from the Company for his role as a director. As a trusted director,

he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Puckett has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, netting personal proceeds of approximately $33,000. For these reasons, too, Defendant Puckett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178. Additional reasons that demand on Defendant Winter is futile follow. Defendant Winter has served as a Company director since November 2021. She also serves as the Company's Secretary and as a member of the Nominating & Governance Committee. The Company provides her with her principal occupation for which she receives lucrative compensation. As a trusted director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Winter has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $109,202. For these reasons, too, Defendant Winter breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179. Additional reasons that demand on the Board is futile follow.

180. Defendants Puckett (as Chair), Andersen, and Betor served as members of the

Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

181.  In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

182.  Mullen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Mullen any part of the damages Mullen suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

183.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

184.    The acts complained of herein constitute violations of fiduciary duties owed by Mullen's officers and directors, and these acts are incapable of ratification.

185.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Mullen. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Mullen, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

186.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Mullen to sue the Individual Defendants named herein, since, if

they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

187.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

188.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mullen's business and affairs.

190.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

191.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Mullen.

192.    In breach of their fiduciary duties owed to Mullen, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company claimed it had an intent to implement a reverse stock split in early 2023, when it had no intent to do so; (2) the Company overstated its deals with its purported business partners, MAEO and RRDS; (3) the Company overstated its battery technology; (4) Defendants mislead the public about future reverse stock splits; (5) Defendants failed to conduct proper due diligence and disclosure regarding Hardge's previous financial crimes;

and (6) Defendants failed to disclose material information about the Company's financing agreements, including those with Esousa Holdings. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

193.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

194.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

195.   In yet further breach of their fiduciary duties, during the Relevant Period, while shares of Company common stock traded at artificially inflated prices before the fraud was exposed, four of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $6.6 million.

196.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mullen's securities.

197.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they

caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mullen's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

198.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Mullen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff, on behalf of Mullen, has no adequate remedy at law.

<u>**SECOND CLAIM**</u>
**Against the Individual Defendants for Unjust Enrichment**

201.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Mullen.

203.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Mullen that was tied to the performance or artificially inflated valuation of Mullen, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

204.    Plaintiff, as a shareholder and a representative of Mullen, seeks restitution

from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

205.    Plaintiff, on behalf of Mullen, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

206.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Mullen, for which they are legally responsible.

208.    As a direct and proximate result of the Individual Defendants' abuse of control, Mullen has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff, on behalf of Mullen, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

210.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Mullen in a manner consistent with the operations of a publicly held corporation.

212.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Mullen has sustained and will continue to sustain significant damages.

213.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

214.   Plaintiff, on behalf of Mullen, has no adequate remedy at law.

### FIFTH CLAIM
**Against Individual Defendants for Waste of Corporate Assets**

215.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

217.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Mullen to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

218.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

219.   Plaintiff, on behalf of Mullen, has no adequate remedy at law.

### SIXTH CLAIM
**Against Defendants Michery and New for Contribution Under Sections 10(b) and 21D of the Exchange Act**

220.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.   Mullen and Defendants Michery and New are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class

Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Michery's and Defendant New's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

222.  Defendants Michery and New because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

223.  Accordingly, Defendants Michery and New are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

224.  As such, Mullen is entitled to receive all appropriate contribution or indemnification from Defendants Michery and New.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)  Declaring that Plaintiff may maintain this action on behalf of Mullen, and that Plaintiff is an adequate representative of the Company;

(b)  Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Mullen;

(c)  Determining and awarding to Mullen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)  Directing Mullen and the Individual Defendants to take all necessary actions to reform and improve Mullen's corporate governance and internal procedures to comply with applicable laws and to protect Mullen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for

shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

       1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

       2. a provision to permit the shareholders of Mullen to nominate at least four candidates for election to the Board;

       3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

   (e)    Awarding Mullen restitution from Individual Defendants, and each of them;

   (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

   (g)    Granting such further relief as the Court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: April 8, 2025         Respectfully submitted,

                     **THE BROWN LAW FIRM, P.C.**

                     */s/*Robert C. Moest         
                     Robert C. Moest, Of Counsel, SBN 62166
                     2530 Wilshire Boulevard, Second Floor
                     Santa Monica, CA 90403
                     Telephone: (310) 915-6628
                     Facsimile: (310) 915-9897
                     Email: RMoest@aol.com

                     *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

# **VERIFICATION**

I, Gary Morga, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6__ day of April, 2025.

Signed by:

*Gary Morga*

79E88E5DDEA9422...

Gary Morga